UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § | |
| v. | § § | EP-20-CR-01617-DCG |
| ERNESTO LARA-HIDALGO. | § § | |

## MEMORANDUM ORDER

Presently before the Court is Defendant Ernesto Lara-Hidalgo's ("Defendant") "Motion to Suppress" ("Motion") (ECF No. 19) filed on August 5, 2020. On September 28, 2020, the Court held an evidentiary hearing on the Motion in which the parties presented their evidence and arguments. *See* ECF No. 29. For the reasons that follow, the Court **GRANTS IN PART, DENIES IN PART** Defendant's Motion.

### I. BACKGROUND

**A. Before the Traffic Stop.**

On June 5, 2020, in the afternoon, Defendant was in the front-passenger seat of a 2002 gold Nissan Sentra coaching his girlfriend how to drive a manual transmission (or stick-shift) vehicle. Mot. at 1, ECF No. 19. Defendant's sister was sitting in the backseat. *Id.* The three of them were driving around in Sierra Blanca, Texas, near Interstate 10 ("I-10"). *Id.* Around the same time, Border Patrol Agent Lorenzo Lozano, a ten-year veteran of the Border Patrol, was driving in a marked unit along an access road north of I-10 to travel eastbound towards the Sierra Blanca Border Patrol Station. Resp. in Opp'n at 2, ECF No. 22. According to Agent Lozano, this access road is primarily used by Sierra Blanca residents and Border Patrol employees (a population of about 500 to 600), but it is also often used by illegal aliens and alien smugglers to circumvent the immigration inspections at the Sierra Blanca Border Patrol Checkpoint. *Id.*

At approximately 1:50 p.m., while still driving on the access road, Agent Lozano noticed that the gold Nissan Sentra was heading eastbound very slowly ahead of him at around ten miles per hour. *Id.* Agent Lozano did not recognize the vehicle as belonging to any of the local residents, nor to any of the Border Patrol employees who worked at the Sierra Blanca Station. *Id.* He also noticed that the vehicle was from out-of-state because it displayed New Mexico license plates. *Id.* As he approached the vehicle from the back, at about twenty feet away from it, Agent Lozano noticed that the rear passenger first looked back towards his direction through the rear window and then leaned over to speak to the front-seat passenger. The front-seat passenger then also turned to look back towards the direction of Agent Lozano, after which he made some hand movements to the driver.

After the vehicle stopped at an intersection, Agent Lozano ran called in the license plate number on his radio to request information about the vehicle's registration and history of crossing through ports of entry or immigration checkpoints during the last 72 hours. Mot. at 2; Resp. in Opp'n at 2. Agent Lozano then learned that the vehicle was registered to an individual from Carlsbad, New Mexico, which is two hours north of Sierra Blanca, and that the vehicle had not crossed through a port of entry or immigration checkpoint in the last 72 hours. Mot. at 2; Resp. in Opp'n at 2–3. As the vehicle entered the intersection to head eastbound, it suddenly stalled, turned on the hazard lights, and stopped on the right side of the road. Mot. at 2; Resp. in Opp'n at 2–3.

At this point, Agent Lozano states that he became suspicious enough to stop the vehicle because of the occupants' behavior, the stalling of the car, the fact that the car was from out-of-state, and that it was driving along an access road frequently used for alien smuggling. Mot. at 2; Resp. in Opp'n at 3.

## B. The Traffic Stop.

After the vehicle stopped on the right side of the road, Agent Lozano stopped behind it in his marked unit and turned his flashing lights on. He then approached the vehicle in full uniform and saw the vehicle's three occupants: Defendant's girlfriend (the driver), Defendant (the front-seat passenger), and Defendant's sister (the backseat passenger). Mot. at 2; Resp. in Opp'n at 3. Agent Lozano asked everyone in English for their immigration status and identification, but Defendant's girlfriend responded in Spanish that she did not understand English. After Agent Lozano asked again for the same information in Spanish, she presented her lawful permanent resident card. Defendant allegedly told Agent Lozano that he was a United States citizen but that he had left his identification in his residence in Hobbs, New Mexico. Defendant's sister similarly told him that she was a lawful permanent resident but that she had left her identification at home in Van Horn, Texas. Mot. at 2; Resp. in Opp'n at 3. Agent Lozano then asked for Defendant's and his sister's complete name and date of birth to run a records-check on them. Mot. at 2; Resp. in Opp'n at 3.

While Agent Lozano awaited the results of the records-check, other Border Patrol agents arrived at the scene as backup. Allegedly, Defendant and his sister both admitted to these other agents that they were illegally in the country. Agent Lozano confirmed this information when he received the results of the records-check. Both Defendant and his sister were arrested and taken to the Sierra Blanca Station at around 2:15 p.m. for further processing. Mot. at 2; Resp. in Opp'n at 3–4. At the station, Defendant's fingerprints were taken and run through a database to determine his immigration history and status, which returned positive results for prior immigration and criminal history. Resp. in Opp'n at 4. Defendant then answered a series of biographical questions, admitting that he was a citizen and native of Mexico. *Id.* He was

advised of his *Miranda* rights, which he waived, and then he provided a sworn statement. *Id.* Defendant admitted to being previously removed from the United States and that he illegally crossed into the country four months before. Mot. at 3; Resp. in Opp'n at 4.

On July 9, 2020, the Government filed a one-count indictment charging Defendant with illegal reentry in violation of 8 U.S.C. § 1326(a). Indictment, ECF No. 10. On August 5, 2020, Defendant filed the instant motion. Mot. at 1.

## II. STANDARD

"It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977). However, in certain situations, the burden of persuasion shifts to the government. *Id.* For example, "[w]hen the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). Further, the government also bears the burden of proving that a confession obtained during custodial interrogation is admissible. *Taylor v. Alabama*, 457 U.S. 687, 690 (1982); *de la Fuente*, 548 F.2d at 533. However, in order to shift the burden to the government, the defendant must first discharge his initial burden of producing some evidence, based on specific factual allegations, sufficient to make a *prima facie* showing of illegality. *United States v. Lyons*, 31 F. App'x 833 (5th Cir. 2002).

## III. DISCUSSION

By his Motion, Defendant seeks to exclude all evidence derived and flowing from his alleged illegal seizure. Mot. at 3. Specifically, Defendant seeks to exclude the following:

1. **[Defendant's] statements not related to his identity.** These statements
   include him allegedly saying that:

      a. he was a U.S. citizen;
      b. he forgot his identification card at his home in Hobbs, New Mexico;
      c. he entered the United States on or about February 15, 2020, at 1 a.m. by walking across the international boundary from Mexico into the United States approximately one mile from El Paso, Texas, without being inspected by immigration officers;
      d. he was a Mexican citizen;
      e. he did not have the legal documents necessary to enter, pass through, or remain in the United States;
      f. he did not have any fear of returning to Mexico;
      g. he previously entered the United States approximately two years ago by walking from Juarez, Mexico, to El Paso, Texas;
      h. he had been ordered removed or deported from the United States; and
      i. he has not applied to the Secretary of the Department of Homeland Security for readmission to the United States.

2. **Officers' observations after the seizure, including observations of [Defendant].** This includes:
      a. any testimony describing [Defendant] and other occupants based on what officers saw after the seizure; and
      b. any testimony about the demeanor and behavior of [Defendant] and the other occupants after the seizure.

3. **Statements and testimony by other occupants of the Nissan.** This includes any testimony by other occupants that [Defendant] was in the Nissan, is a Mexican citizen, or had entered unlawfully.

   . . .

4. **[Defendant's] identity-related statements.** This includes him allegedly providing his name and date of birth.

5. **[Defendant's] fingerprints.** These were taken to gather information for a criminal prosecution, not as part of a routine booking procedure.

6. **[Defendant's] photograph.** This was taken to gather information for a criminal prosecution, not as part of a routine booking procedure.

Advisory to the Court at 1–2, ECF No. 31. Defendant bases his Motion in the Fourth Amendment to the United States Constitution, *Bond v. United States,* 529 U.S. 334, 336 (2000) ("The Fourth Amendment provides that '[t]he right of the people to be free in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . .

.'" (quoting U.S. Const. amend. IV)); and the exclusionary rule, *Segura v. United States*, 468 U.S. 796, 804 (1984) ("The suppression or exclusionary rule is a judicially prescribed remedial measure [that] . . . reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" (internal citations omitted)). In view of the facts and arguments before the Court, this case presents two determinative questions:

1) Did Agent Lozano have reasonable suspicion to stop the vehicle in which Defendant was a passenger?

2) If he did not have reasonable suspicion to conduct the stop, what evidence must be suppressed?

The Court will address each of these questions in turn.

**A. Reasonable Suspicion**

Defendant argues that Agent Lozano did not have reasonable suspicion to stop the vehicle in which Defendant was traveling. In short, Defendant contends that the totality of the circumstances show that none of the *Brignoni-Ponce* factors support a finding of reasonable suspicion, particularly because "merely driving in an area 'notorious for alien smuggling' alone, does not constitute reasonable suspicion." Mot. at 5 (quoting *United States v. Rangel-Portillo*, 586 F.3d 376, 380 (5th Cir. 2009)). But the Government avers that the record does support a finding of reasonable suspicion because, relying on his ten years of experience as a Border Patrol agent, Agent Lozano (1) saw the vehicle use an access road about thirty-four miles from the border that is regularly used by alien smugglers; (2) noticed that the vehicle was from out of state and did not belong local residents; and (3) observed the occupants' questionable behaviors and gestures towards him. Resp. in Opp'n at 6–7. After due consideration, the Court agrees with

Defendant that the totality of the circumstances indicate that Agent Lozano did not have sufficient reasonable suspicion for the stop.

"When conducting roving patrols, border patrol agents may temporarily stop a vehicle 'only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicle's occupant is engaged in criminal activity.'" *United States v. Hernandez-Mandujano*, 721 F.3d 345, 348 (5th Cir. 2013) (quoting *United States v. Soto*, 649 F.3d 406, 409 (5th Cir. 2011). The Supreme Court in *Brignoni–Ponce* articulated several factors for "deciding whether there is reasonable suspicion to stop a car in the border area." *United States v. Brignoni–Ponce*, 422 U.S. 873, 884 (1975). These factors include (1) proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) the agents' experience in detecting illegal activity; (5) the driver's behavior; (6) particular aspects or characteristics of the vehicle; (7) information regarding recent border crossings or narcotics transportation in the area; and (8) the number of passengers and their appearance and behavior. *Hernandez-Mandujano*, 721 F.3d at 348 (citing *United States v. Moreno–Chaparro*, 180 F.3d 629, 631–32 (5th Cir. 1998)). None of the *Brignoni-Ponce* factors is dispositive. *Rangel-Portillo*, 586 F.3d at 380. Rather, courts must consider the "totality of the circumstances" to determine whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

Here, the Court is of the view that the only *Brignoni-Ponce* factors that arguably support the Government's position is proximity to the border and Agent Lozano's ten years of experience. Yet, when viewed together with the other factors, these two alone do not justify Agent Lozano's stop.

To be sure, the Government is correct that proximity to the border can be considered a "paramount factor" in the reasonable suspicion analysis and that any stop within fifty miles from the border weighs heavily in favor of reasonable suspicion. Resp. in Opp'n at 5 (citing *United States v. Garza*, 727 F.3d 436, 440–441 (5th Cir. 2013). But the Government's argument overlooks the fact that Agent Lozano called in the license plate number on his radio and confirmed that the vehicle had no history of crossing through ports of entry or immigration checkpoints during the last 72 hours. Simply put, because Agent Lozano had no reason to believe that the vehicle had come from the border, the proximity-to-the-border factor substantially loses its weight. *See United States v. Freeman,* 914 F.3d 337, 343 (5th Cir. 2019) ("If there is no reason to believe that the vehicle has come from the border, the remaining factors must be examined charily.") (internal quotation marks omitted); *see also id.* ("[W]e hesitate to conclude that driving on a road coming from a densely populated city such as Laredo, even if situated along the border, can weigh *heavily* in favor of reasonable suspicion.") (emphasis in original).

While the stop occurred on an access road parallel to I-10, "a major corridor for illegal alien-smuggling between cities in Texas, such as Houston, and the East Coast," *Hernandez-Mandujano*, 721 F.3d at 349, "merely driving in an area 'notorious for alien smuggling,' alone, does not constitute reasonable suspicion." *Rangel-Portillo*, 586 F.3d at 380 n.3 (quoting *United States v. Morales*, 191 F.3d 602, 604–05 (5th Cir. 1999)). This factor's significance is further abated by the fact that, as Agent Lozano himself testified at the hearing, there were no reports of recent suspected alien smuggling activity around the area. Were the Court to find otherwise, Border Patrol agents "would be free to stop any vehicle on virtually any road anywhere near the Texas-Mexico border." *United States v. Diaz*, 977 F.2d 163, 165 (5th Cir. 1992).

Agent Lozano also testified that he conducted the stop around the time when Border Patrol employees at the Sierra Blanca Checkpoint have their change-of-shift, during which alien and drug smuggling activity supposedly increases because smugglers are aware of this "window of opportunity." But the absence of any reports of recent suspected alien smuggling activity around the area at that time for that day also diminishes the significance of this fact in analyzing the traffic patterns of the area. Moreover, this factor is also abated by the fact that nothing on the record indicates that there was anything irregular or unusual about the vehicle or its travel pattern at that time of the day to suggest that criminal activity was afoot. *Cf. United States v. Robles-Avalos*, 895 F.3d 405, 409 (2018) ("[O]nly usual traffic at that time of night is local ranch vehicles," not the defendant's sedan). Indeed, Agent Lozano conceded at the hearing that the vehicle was not unusually dirty or clean, that it did not look weighed down, and that the number of its occupants did not raise any suspicion. *See Hernandez-Mandujano*, 721 F.3d at 350 ("Agents Sullivan and Taylor identified nothing suspicious about this particular SUV—that is, they noted no aspects of the SUV that rendered it any more likely than other SUVs to be transporting illegal aliens. . . . Indeed, it was only an average SUV on a Louisiana highway.") (citations omitted).

The only "unusual" characteristic of the vehicle that caught Agent Lozano's attention was its license plate from the neighboring state of New Mexico. Yet, that characteristic alone does not raise any suspicion of criminal activity, especially after Agent Lozano ascertained that the vehicle was registered to an individual from the neighboring city of Carlsbad, New Mexico, and that the vehicle had not crossed the border in the last 72 hours. Also absent from the record is any report or information suggesting that the vehicle was stolen or that it was involved in

criminal activity. Hence, the *Brigoni-Ponce* factor on vehicle characteristics also does not weigh in the Government's favor.

As to the occupants' behavior, Agent Lozano could only point out to their gestures to each other after they turned back to look towards his direction. But his observations "do not measurably contribute to reasonable suspicion in the absence of any other compelling evidence." *Id.* at 350. Whether the vehicle's occupants looked or failed to look back towards Agent Lozano, who was trailing close behind them in his marked unit, "taken alone or in combination with other factors, should be accorded little weight." *Id.* "Similarly, conversations are subject to natural variation, waxing and waning at irregular intervals. If there were other strong indicators of reasonable suspicion, this factor may help contribute, but it is necessarily a weak factor and of especially light weight in a case such as this." *Id.* In fact, "[n]ot only are innocent explanations available [for this kind of behavior], but they are probable." *United States v. Olivares-Pacheco*, 633 F.3d 399, 403 (5th Cir. 2011). For one thing, any law-abiding citizen who is learning how to drive—as Defendant alleges his girlfriend was doing—could be reasonably distressed upon seeing other vehicles trailing close behind, especially if that vehicle belongs to law enforcement. That Defendant's girlfriend was allegedly learning to drive with a manual transmission can also provide an innocent explanation as to why the vehicle was slowly traveling at around ten miles per hour and why it later stalled.

Therefore, the Court concludes that the totality of the circumstances indicate that Agent Lozano did not have sufficient reasonable suspicion to justify the stop. In other words, Agent Lozano's actions constituted an unconstitutional seizure.

**B. Exclusionary Rule.**

"'Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion,' as is 'evidence later discovered and found to be derivative of any illegality or fruit of the poisonous tree.'" *United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)) (emphasis omitted).

Of Defendant's six outstanding suppression requests, the Court finds that the first three directly derived from the constitutionally infirm stop and will thus order each one suppressed. Suppression requests one and three both concern statements that Defendant made to the Border Patrol agents which he would not have made but for the stop. In a similar vein, suppression request two relates to Agent Lozano's observations of Defendant's demeanor and behavior, which Agent Lozano would not have had an opportunity to make had he not stopped Defendant.

However, Defendant candidly recognizes that the law of this Circuit, mainly *United States v. Roque-Villanueva*, 175 F.3d 345 (5th Cir. 1999), is contrary to his position on suppression requests four, five, and six, all relating to evidence of his identity—namely, his identity-related statements, fingerprints, and photograph. Mot. at 6–7. Notwithstanding, he contends that the Court can still suppress such evidence because the Fifth Circuit in *Roque-Villanueva* "did not specify that identity-related evidence obtained as a product of the stop is not suppressible, only that his ultimate identity and the A-file could not be suppressed." Advisory to the Court at 2.

But the Court notes that the Fifth Circuit and other courts within it have construed *Roque-Villanueva* to be a blanket rule foreclosing the suppression of *all* identity-related evidence, not just a defendant's identity and A-file. *See, e.g., United States v. Avelar-Castro*, 637 F. App'x. 177, 178 (5th Cir. 2016) (affirming district court's ruling that "even if . . . a Fourth Amendment

violation occurred, evidence establishing Avelar's guilt (evidence of his identity), is not suppressible."); *United States v. Rodriguez*, 672 F. App'x. 451, 452 (5th Cir. 2016) ("As Rodriguez concedes, even assuming that the immigration stop was illegal, his argument that the district court should have suppressed his identity evidence is foreclosed."); *United States v. Montes-Nunez*, No. EP-15-CR-14-PRM (W.D. Tex. Apr. 16, 2015), ECF No. 30, *aff'd*, 644 F. App'x 350 (5th Cir. 2016) (not suppressing identity-related statements, fingerprints, photograph); *United States v. Cervantes-Malagon*, 457 F. App'x. 364, 365 (5th Cir. 2012) ("[E]ven if there was a Fourth Amendment violation, this court has held that evidence of identity, such as one's fingerprints and A-file, is not suppressible."); *United States v. Rodriguez-Castorena*, 417 F. App'x. 409, 410 (5th Cir. 2011) ("Because the fingerprints themselves did nothing more than identify Rodriguez–Castorena and did not constitute affirmative evidence of his crime, we conclude that this argument also fails under [Fifth Circuit] precedent[.]"); *United States v. Baeza-Castillo*, 72 F. App'x. 170, 171 (5th Cir. 2003) ("Even assuming that [the defendant's] arrest was illegal," [suppression of his fingerprints and A-file] "is foreclosed by our precedent."); *United States v. Lopez-Guerrero*, EP-00-CR-1498-DB, 2000 WL 33348233, at *4 (W.D. Tex. Nov. 30, 2000) ("[N]otwithstanding Defendant's stubborn insistence that any identification evidence and corresponding immigration history is a 'fruit' of an illegal search, Defendant cannot prevent the Government from introducing that evidence at trial.").

The Court acknowledges that, in *United States v. Hernandez–Mandujano*, 721 F.3d 345 (5th Cir. 2013), Judge Jolly expressed considerable reservations about the Fifth Circuit's blanket rule and noted that other circuits do allow suppression of identity-related evidence under certain circumstances. *Id.* at 351–352 (Jolly, J., concurring). Specifically, Judge Jolly believed that, in

comparison to the other circuits, the Fifth Circuit had erroneously construed *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032 (1984), in creating such rule because

> If the [Supreme] Court had been saying that statements relating to one's identity were never suppressible, [its] rigorous analysis of the costs and benefits of excluding such evidence in a civil deportation hearing would have been wholly superfluous. I virtually repeat myself to observe, as the Fourth, Eighth, and Tenth Circuits highlighted, that if evidence relating to identity were excluded from the general rule, the Court almost certainly would have said so, rather than treating it as it would treat any other potentially suppressible evidence.

*Hernandez-Mandujano*, 721 F.3d at 354 (Jolly, J., concurring). In closing, Judge Jolly expressed that

> allowing our erroneous interpretation of *Lopez–Mendoza* to persist essentially affords law enforcement officers staggering authority to detain anyone they suspect of being an illegal alien, for so long as they retrieve only evidence related to that person's identity, they will escape any ramifications for even grossly unconstitutional behavior. Thus, while precedent requires me to concur with the majority, I hope I have made clear that our precedent is an incomplete and erroneous reflection of the propositions for which *Lopez–Mendoza* stands.

*Id.* at 356 (Jolly, J., concurring). His conclusion suggests that such rule, as it stands, creates an insidious incentive for law enforcement officers because it encourages them to stop anyone, including United States citizens and anyone lawfully present in the country, without reasonable suspicion and violate their Fourth Amendment rights with impunity. Simply put, such rule makes the exclusionary rule meaningless and contrary to its stated purpose: "to deter unlawful police conduct." *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006); *see also United States v. Leon,* 468 U.S. 897, 919 (1984) ("The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused."). Justice

O'Connor herself agreed with the respondents in *Mendoza* that the application of the exclusionary rule in this type of context raised "legitimate and important concerns" because "retention of the exclusionary rule is necessary to safeguard the Fourth Amendment rights of ethnic Americans, particularly the Hispanic–Americans lawfully in this country." *Lopez-Mendoza*, 468 U.S. at 1045.

Regardless, the Court is duty bound to apply the law as it currently exists in this Circuit, which, as Judge Jolly notes in his concurrence, provides that identity evidence is not suppressible. *Hernandez–Mandujano*, 721 F.3d at 751; *accord United States v. Medrano-Martinez*, SA-14-CR-87-XR, 2014 WL 3824206, at *3 (W.D. Tex. Aug. 1, 2014); *see also United States v. Traxler*, 764 F.3d 486, 489 (5th Cir. 2014) (noting that the rule of orderliness prevents a panel's interpretation, even if flawed, from being declared void by a subsequent panel "absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or [the Fifth Circuit] *en banc*[.]").

## IV.  CONCLUSION

Accordingly, **IT IS ORDERED** that Defendant Ernesto Lara-Hidalgo's "Motion to Suppress" (ECF No. 19) is **GRANTED IN PART, DENIED IN PART**. The Court **GRANTS** the Motion with respect to his suppression requests one (all statements not related to his identity), two (all observations after the seizure, including Defendant's observations), and three (all statements and testimony by other occupants of the vehicle). The Court **DENIES** the Motion in all other respects.

So ORDERED and SIGNED this 8th day of October 2020.

*/s/ David C. Guaderrama*
**DAVID C. GUADERRAMA**
**UNITED STATES DISTRICT JUDGE**